**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 12, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BERRY & MURPHY, P.C.;
TIMOTHY H. BERRY, P.C.,

       Plaintiffs-Appellants,

v.

CAROLINA CASUALTY
INSURANCE COMPANY,

       Defendant-Appellee.

No. 09-1004

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:08-cv-01903-RPM)**

---

Steven J. Dawes (Sophia H. Tsai with him on the briefs), of Light, Harrington & Dawes, P.C., for Plaintiffs-Appellants.

Jeffrey A. Goldwater of of Bollinger, Ruberry & Garvey, Chicago, Illinois, (Perry M. Shorris, Bollinger, Ruberry & Garvey, Chicago, Illinois; Patrick Q. Hustead and Melissa W. Shisler, the Hustead Law Firm, Denver, Colorado, with him on the brief), for Defendant-Appellee.

---

Before **HENRY,** Chief Circuit Judge, **BRISCOE,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiffs-Appellants Berry & Murphy, P.C. and Timothy H. Berry, P.C. ("plaintiffs") appeal the district court's grant of summary judgment to Defendant-Appellee Carolina Casualty Insurance Company ("Carolina Casualty") on plaintiffs' claim for insurance coverage for a malpractice lawsuit. Plaintiffs filed their action in state court and Carolina Casualty removed the case to federal court, alleging diversity jurisdiction under 28 U.S.C. § 1332. The district court concluded that Carolina Casualty had no duty to defend or indemnify plaintiffs because a claim was first made against "an insured" in January 2007 – more than one year prior to the policy period.

We have jurisdiction over plaintiffs' timely appeal pursuant to 28 U.S.C. § 1291 and affirm.

I

Oksana and William Burkhardt (the "Burkhardts") hired Seth Murphy, a co-shareholder of the law firm of Berry & Murphy, P.C., to represent them in a personal injury suit arising out of an alleged assault by Joseph Ciri (the "Ciri Lawsuit"). In January 2005, Murphy filed a complaint on behalf of the Burkhardts in Colorado state court. The Ciri Lawsuit was governed by Colorado's simplified procedure rule, Colo. R. Civ. P. 16.1, and Murphy did not opt out of proceeding under Rule 16.1.[1]

---

[1] Colorado provides for "Simplified Procedure" for civil actions wherein
(continued...)

Over a year later, in March 2006, Murphy left Berry & Murphy, P.C. and joined the law firm of Richmond, Neiley, Sprouse, & Murphy, LLC. Murphy took the Ciri Lawsuit with him to his new law firm. About the same time, however, Murphy filed a motion to withdraw as counsel from the Ciri Lawsuit because he was allegedly having a difficult time getting the Burkhardts to cooperate in the prosecution of their claims.

In April 2006, the defendants in the Ciri Lawsuit filed a motion to dismiss for failure to prosecute. The motion to dismiss alleged: (1) failure to supplement initial disclosures regarding damages as required by Colo. R. Civ. P. 26(a); (2) failure to respond to a November 2005 letter from defendants' counsel regarding additional disclosures; (3) failure to produce a release for medical records for the previous five years; (4) failure to produce complete billing information from medical providers; (5) failure to produce employment records in violation of Colo. R. Civ. P. 16.1(k)(1)(B)(ii); (6) failure to disclose any expert witness before the deadline set forth in Rule 16.1(k)(2); and (7) failure to produce non-expert witness information pursuant to Rule 16.1(k)(3). At the end of May 2006, the court orally granted Murphy's motion to withdraw as counsel from the Ciri

---

[1](...continued)
the "maximum allowable monetary judgment" is $100,000 against a party and early disclosures are required. Colo. R. Civ. P. 16.1(a)(2). The simplified procedure rule applies unless the party "timely and properly elects to be excluded from its provisions." Id.

3

Lawsuit.  Shortly thereafter, on June 27, 2006, the court granted, without prejudice, the defendants' motion to dismiss for failure to prosecute and entered a written order granting Murphy's motion to withdraw.

The Burkhardts then hired new counsel and moved for reconsideration of the order dismissing their lawsuit and for reinstatement of the case.  In November 2006, the court granted the Burkhardts' motion.  The court also ordered the Burkhardts to file new non-expert witness disclosures which complied with Rule 16.1(k)(3) by December 11, 2006.

On January 10, 2007, Cindy Tester, the Burkhardts' new attorney in the Ciri Lawsuit, sent the following letter to Murphy at Richmond, Sprouse & Murphy, LLC (formerly Richmond, Neiley, Sprouse & Murphy, LLC):

> Dear Mr. Murphy:
>
> This is to advise you to put your legal malpractice insurance carrier on immediate notice a [sic] legal malpractice claim that I plan on filing against you on behalf of my clients, Mr. & Mrs. William Burkhardt.  The Court recently found that your conduct in handling the Burkhardts' case was so egregious and so woefully inadequate that the case was nearly dismissed.  Only through over hundreds of hours of pleadings practice, thousands of dollars paid to experts to obtain expert reports and innumerable hours of work put into this case since I took it over, were we able to somewhat resurrect this case to give the Plaintiffs a chance at their day in Court.
>
> Moreover, the Court made certain findings as to your conduct and culpability regarding the manner in which you handled this case and the way you flagrantly

4

disregarded your duties as an attorney. As such, put your carrier on notice immediately and give me the name of your insurance adjuster, so I may forward your adjuster a complete copy of the transcript of the Court's findings, the recent pleadings that have been filed in this case, which is still very minimally on tract [sic] at best given the plethora of the Defendants recent pleadings trying yet again to have it dismissed (and it was already dismissed once due to your conduct).

The Plaintiffs shall hold you entirely liable for all your misfeasance and malfeasance concerning your egregious inaction in handling and mishandling this case and the extreme amount of mental anguish, hours put into this case and the precarious position that you have put them in through failing to even remotely properly even the most mediocre attorney could handle a case [sic].

I expect to hear from your carrier shortly.

App. at 216-17 [sic throughout] (hereinafter the "Tester Letter"). The Tester Letter was not sent to Murphy's former co-shareholder, Timothy H. Berry, and Berry was not given notice of the letter at the time. Murphy, upon receipt of the Tester Letter, put his law firm's malpractice carrier—which happened to be Carolina Casualty—on notice of the claim.

Defendants in the state court Ciri Lawsuit, having not received the recently court-ordered material by the end of December deadline, next renewed their request for dismissal of the Ciri Lawsuit. In February 2007, the court denied the defendants' request to dismiss, but struck all but eight of the Burkhardts' potential witnesses and required Rule 16.1(k)(3) compliant non-expert witness disclosures for these eight witnesses by March 27, 2007. The Burkhardts failed to

5

comply with the court's order by this new deadline and defendants then filed a second renewed motion to dismiss. The court granted, with prejudice, the second renewed motion to dismiss in December 2007.[2]

On January 30, 2008, the Burkhardts filed a legal malpractice claim against Seth Murphy and Berry & Murphy, P.C. in the Pitkin County, Colorado district court (the "Malpractice Lawsuit"). The Malpractice Lawsuit generally alleged that Seth Murphy and Berry & Murphy, P.C. missed the deadline for filing a notice to elect exclusion from Simplified Procedures pursuant to Colo. R. Civ. P. 16.1 in the Ciri Lawsuit. The Malpractice Lawsuit also generally alleged that Seth Murphy and Berry & Murphy, P.C. were "negligent" and breached their "fiduciary duty of loyalty" to the Burkhardts. The Malpractice Lawsuit's claimed damages were "loss in the value of a chose, plus litigation costs, attorney fees, and interest." App. at 79.

Berry & Murphy, P.C. was the predecessor firm to Timothy H. Berry, P.C. Timothy H. Berry, P.C. is a Leadville, Colorado professional corporation engaged in the practice of law. As regards the insurance policy for Timothy H. Berry, P.C., "Timothy H. Berry, P.C." was the named insured on a lawyers' professional liability insurance policy issued by Carolina Casualty, an Iowa insurance

---

[2] The Burkhardts appealed the dismissal of the Ciri Lawsuit to the Colorado Court of Appeals, which affirmed the trial court's dismissal of the case. See App. at 288–303 (decision from the Colorado Court of Appeals—Burkhardt et al. v. Ciri et al., No. 08CA0490 (Colo. Ct. App. Apr. 2, 2009)).

6

company. The claims-made insurance policy was effective from February 6, 2008 to February 6, 2009. On July 23, 2008, Timothy Berry accepted service of the Malpractice Lawsuit, and he gave notice to Carolina Casualty of the filing of the Malpractice Lawsuit on that date. Berry alleges he had no knowledge of either the Tester Letter or the Malpractice Lawsuit until he accepted service of the Malpractice Lawsuit on July 23, 2008.

Plaintiffs filed this action to resolve the parties' dispute regarding insurance coverage for the Malpractice Lawsuit. Carolina Casualty denied coverage for the Malpractice Lawsuit on the grounds that the alleged malpractice claim was first made against an insured (i.e., Seth Murphy) prior to the inception of the insurance policy (i.e., via the Tester Letter), thereby falling outside the claims-made coverage of the policy. Plaintiffs' complaint asserts claims for declaratory relief, injunctive relief, breach of contract, and bad faith.

Before the district court, plaintiffs filed a motion for preliminary injunction and a motion for leave to add additional claims. Carolina Casualty and plaintiffs then filed cross-motions for summary judgment. The district court, orally at a motions hearing, granted Carolina Casualty's motion for summary judgment, denied plaintiffs' motion for summary judgment, and found plaintiffs' remaining motions moot. In granting Carolina Casualty's motion, the district court stated:

> I'm going to grant [Carolina Casualty's] motion for summary judgment. [Murphy] is an insured. He had notice from this Tester letter that he was going to be accused, or

7

was directly accused of malpractice in the representation of [the Burkhardts] in the Pitkin County case, and that it had been dismissed. And, it isn't just a question of his failing to timely make this election under Colorado Rule 16.1, it's really the failure to proceed with that lawsuit and make the disclosures, whatever the rule was. And, I think that his further conduct in not notifying his former partner, or firm, that this claim was going to be made for his conduct while he was with that firm, you know, the burden doesn't fall on the insurance company for that.

App. at 286. The district court later awarded costs to Carolina Casualty based on its finding that Carolina Casualty was the prevailing party.

## II

"We review de novo the district court's summary judgment decision, applying the same standard as the district court." Butler v. Compton, 482 F.3d 1277, 1278 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007). We examine the record and "all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006) (quotation omitted).

In addition, we review the district court's interpretation and determination of state law de novo. Freightquote.com, Inc. v. Hartford Cas. Ins. Co., 397 F.3d 888, 892 (10th Cir. 2005). Because this is a diversity action, we "apply the

8

substantive law of the forum state, including its choice of law rules." Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). Colorado is the forum state in this appeal. Under Colorado choice-of-law rules, an insurance contract is governed by the law of the state with the most significant relationship to the insurance contract. See Fire Ins. Exch. v. Bentley, 953 P.2d 1297, 1300 (Colo. Ct. App. 1998) (citing Wood Bros. Homes, Inc. v. Walker Adjustment Bureau, 601 P.2d 1369, 1372 (Colo. 1979)).

Although the record does not address the issue directly, we conclude that Colorado law applies. The insurance contract was apparently negotiated and entered into in Colorado and the insured's place of business is in Colorado. See Wood Bros. Homes, Inc., 601 P.2d at 1372 nn.3–4 (listing factors to be taken into account to determine the state with the most significant relationship). Colorado therefore has the most significant relationship to the insurance policy.

Colorado courts "construe an insurance policy's terms according to principles of contract interpretation." Thompson v. Md. Cas. Co., 84 P.3d 496, 501 (Colo. 2004). In Thompson, a duty to defend insurance policy case, the Colorado Supreme Court said:

> In interpreting a contract, we seek to give effect to the intent and reasonable expectations of the parties. Accordingly, unless the parties intend otherwise, terms in an insurance policy should be assigned their plain and ordinary meaning.
>
> We also recognize that unlike a negotiated contract, an

9

insurance policy is often imposed on a "take-it-or-leave-it" basis. Therefore, we assume a "heightened responsibility" in reviewing insurance policy terms to ensure that they comply with public policy and principles of fairness. Accordingly, ambiguous terms in an insurance policy are construed against the insurer.

Id. at 501–02 (internal citations omitted).

*A. The policy language.*

We turn then to the language of the insurance policy at issue. See State Farm Mut. Auto. Ins. Co. v. Nissen, 851 P.2d 165, 166 (Colo. 1993) ("Our starting point is the plain language of the contract and the intent of the parties as expressed in that language."). The insurance policy contains the following "Insuring Agreement":

> This Policy shall pay on behalf of the **Insured** all **Damages** and **Claims Expense** that the **Insured** shall become legally obligated to pay, arising from any **Claim** first made against an **Insured** during the **Policy Period** and reported to the **Insurer** in writing during the **Policy Period** or within 60 days thereafter, for any **Wrongful Act**, provided that prior to the inception date of the first Lawyers' Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured**, which has been continuously renewed and maintained in effect to the inception of this **Policy Period**, the **Insured** did not know, or could not reasonable foresee that such **Wrongful Act** might reasonably be expected to be the basis of a **Claim**.

App. at 39.[3] The insurance policy also provides that "[t]he **Insurer** shall have the

---

[3] The policy at issue is a "claims made policy," one that "confers coverage for claims presented during the policy period." Hoang v. Assurance Co. of Am.,

(continued...)

right and the duty to defend any **Claim** to which this insurance applies . . . ." Id. at 43.

The insurance policy defines the bold-faced terms. "Claim" is defined as "a written demand for monetary or non-monetary relief including, but not limited to, a civil, criminal, administrative or arbitration proceeding . . . . A **Claim** shall be deemed to have been first made at the time notice of the **Claim** is first received by any **Insured**." Id. at 40. The insurance policy defines "Wrongful Act" as "any actual or alleged act, omission, or **Personal Injury** arising out of **Professional Services** rendered by an **Insured** or by any person for whose act or omission the **Insured** is legally responsible" and "Related Wrongful Act" as "**Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision."

---

[3](...continued)
149 P.3d 798, 802 (Colo. 2007) (citing 8 John W. Grund & J. Kent Miller, Colorado Personal Injury Practice–Torts and Insurance § 46.6 (2000)); see also Lee R. Russ & Thomas F. Segalla, 1 Couch on Insurance § 1:5 (3d ed. 1996) (explaining that "'[c]laims made' policies, which have become a popular means for insuring against professional malpractice, differ from traditional 'occurrence' policies primarily in the scope of the risk against which they insure. In a claims made policy, coverage is effective if a negligent or omitted act is discovered and brought to the attention of the insurance company during the period of the policy, no matter when the act occurred. In an occurrence policy, coverage is effective if a negligent or omitted act occurred during the period of the policy, whatever the date of claim against the insured. Thus, the basic difference between these types of policies is that a 'claims made' policy provides unlimited retroactive coverage and no prospective coverage at all, while an 'occurrence' policy provides unlimited prospective coverage and no retroactive coverage at all.").

11

Id. at 41.  And finally, the insurance policy has a section titled "Notice of Claim and Multiple Claims" which states in pertinent part:

A.  As a condition precedent to their rights under this Policy, an **Insured** shall give the **Insurer** written notice of any **Claim** as soon as practicable.

B.  If during the **Policy Period** an **Insured** becomes aware of any fact, circumstance or situation which may reasonably be expected to give rise to a **Claim** being made against any **Insured** and shall give written notice to the **Insurer**, as soon as practicable (but prior to the expiration or cancellation of the Policy), of:

1.  the specific fact, circumstance or situation, with full details as to dates, persons, and entities involved; and

2.  the injury or damages which may result therefrom; and

3.  the circumstances by which the **Insured** first became aware thereof;

then any **Claim** subsequently made arising out of such fact, circumstance or situation shall be deemed to have been made when notice was first given to the **Insurer**.

C.  All **Claims** based upon or arising out of the same **Wrongful Acts** or any **Related Wrongful Acts**, or one or more series of any similar, repeated or continuous **Wrongful Act** or **Related Wrongful Acts**, shall be considered a single **Claim**. Each **Claim** shall be deemed to be first made at the earliest of the following times:

1.  when the earliest **Claim** arising out of such **Wrongful Act** or **Related Wrongful Acts** is

12

> > > <u>first made</u>, or
>
> > 2.  when notice pursuant to section [] B. of a fact, circumstance or situation giving rise to such **Claim** is given.

<u>Id.</u> at 43 (underlining emphasis added).

We do not find any of the terms above to be ambiguous—they all have plain and ordinary meanings that can be applied to the language of the insurance policy. <u>See</u> <u>Cary v. United of Omaha Life Ins. Co.</u>, 108 P.3d 288, 290 (Colo. 2005) ("An insurance policy is ambiguous if it is susceptible on its face to more than one reasonable interpretation. . . . A mere disagreement between the parties concerning interpretation of the policy does not create an ambiguity. To determine whether a policy contains an ambiguity, we must evaluate the policy as a whole." (internal citations omitted)). Therefore, we will enforce the insurance policy as written. <u>See</u> <u>Hoang</u>, 149 P.3d at 801 ("In interpreting a contract, we give effect to the intent and reasonable expectations of the parties. We must enforce the plain language of the policy unless it is ambiguous." (internal citations omitted)).

*B. Do the Tester Letter and the Malpractice Lawsuit involve a single claim?*

We must first determine whether the Tester Letter and the Malpractice Lawsuit allege "related wrongful acts" which would be considered as one "claim" under the policy. Here, the insurance policy required that, as a condition precedent to triggering rights under the policy, an "Insured" must give the

13

"Insurer" written notice of the claim "as soon as practicable." App. at 43.[4]  And, a "claim" is deemed to have been first made at the time notice of the "claim" is first received by "<u>any</u> Insured." <u>Id.</u> at 40 (emphasis added).  Further, all claims "based upon or arising out of the same **Wrongful Acts** or any **Related Wrongful Acts**, or one or more series of any similar, repeated or continuous **Wrongful Act** or **Related Wrongful Acts**, shall be considered a single **Claim**." <u>Id.</u> at 43.  And, a "claim" is first made when "the earliest **Claim** arising out of such **Wrongful Act** or **Related Wrongful Acts** is first made." <u>Id.</u>

Therefore, the first step in untangling the factual scenario in this case is to analyze the insurance policy's definition of "related wrongful act."  If the Tester Letter makes a claim that is a "related wrongful act" to the Malpractice Lawsuit, then the Tester Letter was the first notice of the "claim."  As stated above, a "related wrongful act" is defined as "**Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision." <u>Id.</u> at 41.  Therefore, we must determine whether the acts alleged in the Tester Letter and the Malpractice Lawsuit are "logically or causally connected."

---

[4] "[T]he event that invokes coverage under a 'claims-made' policy is the transmittal of notice of the claim to the insurance carrier." <u>St. Paul Fire & Marine Ins. Co. v. Estate of Hunt</u>, 811 P.2d 432, 434 (Colo. Ct. App. 1991).

14

Plaintiffs cite the federal district court case[5] of <u>Professional Solutions Ins. Co. v. Mohrlang</u>, No. 07-cv-02481-PAB-KLM, 2009 WL 321706 (D. Colo. Feb. 10, 2009), in support of their position that the claim asserted in the Tester Letter and the claims asserted in the Malpractice Lawsuit are not logically or causally connected. In <u>Mohrlang</u>, an insurer filed suit seeking a declaration that the relevant insurance policy did not require payment to the defendants, Harry and Lenora Mohrlang, and Bruce Mohrlang, who became trustee of their various trusts. 2009 WL 321706, at *1. The insurer provided professional malpractice insurance to an attorney and the defendants were clients of that attorney. <u>Id.</u>

The attorney was sent a letter and draft complaint from <u>Bruce</u> Mohrlang which indicated a professional negligence action would be brought against the attorney for the attorney's allegedly deficient advice in negotiating and structuring the sale of the defendants' business. <u>Id.</u> at *2. The attorney was then sent a letter and draft complaint from <u>Harry</u> Mohrlang alleging professional negligence for advice concerning the sale of stock in the defendants' business and breach of "fiduciary duties of loyalty, disclosure, candor" regarding release of promissory notes. <u>Id.</u> The insurance policy at issue was limited to $500,000 per "claim" with a $1,000,000 aggregate term limit; all "related claims" were considered to be a single claim by the policy. <u>Id.</u> at *3.

---

[5] There are no Colorado state court cases analyzing this insurance policy language.

15

The insurance policy defined "claim" as "a demand you receive for money or services, including suit or institution of arbitration proceedings against you." Id. at *3 (internal quotations, alterations, and emphasis omitted). The insurance policy then defined "related claim" as "claims arising out of a single act or omission or arising out of related acts or omissions in the rendering of professional services." Id. (internal quotations and emphasis omitted). And finally, the insurance policy defined "related acts or omissions" as "all acts or omissions in the rendering of professional services that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." Id. (internal quotations and emphasis omitted).

The district court in Mohrlang first found that the language of the insurance policy was not ambiguous and that the policy's terms should be given their plain and ordinary meaning. Id. at *9. The district court then went on to define the "temporally, logically or causally connected" phrase used in the "related acts or omissions" definition of the insurance policy. The district court found no temporal connection between the sale of the business and the breach of fiduciary duties because there was a temporal break between the two events. Id. at *11.

The district court then defined "logically connected" as "connected by an inevitable or predictable interrelation or sequence of events," noting that "for two things to be logically connected, one must attend or flow from the other in an inevitable or predictable way." Id. The district court found no logical connection

16

between the two alleged acts of malpractice because the sale agreement did not account for the promissory note and deed of trust that were the subject of the alleged breaches of fiduciary duties; they were independent obligations. Id.

Finally, the district court defined "causally connected." Id. The district court defined causally connected as "where one person or thing brings about the other." Id. The district court also noted that "the common understanding of causation" requires a showing of but-for causation and "a situation where the first thing leads to the second in a direct and traceable way, and where no independent, significant thing interrupts the causal chain between the two." Id. The district court found that the two alleged acts of malpractice were not causally connected because the sale of the business "did not directly or traceably—and certainly did not foreseeably—lead to the [attorney's] violation of his fiduciary duties." Id. at *12.

Because the district court in Mohrlang found that the alleged acts of malpractice were not "temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice, or decision," the district court concluded that the two claims were not "related claims" under the insurance policy. Id. at *13. Plaintiffs ask us to adopt the result reached in Mohrlang to the facts of this case. While we agree that, like the insurance policy in Mohrlang, the terms of this insurance policy are not ambiguous and should be defined by their plain and ordinary meaning, we conclude that the acts of

17

malpractice alleged in the Tester Letter and the Malpractice Lawsuit are logically or causally connected.

Here, using the common definition of "logically connected" expressed in Mohrlang, the alleged acts of malpractice in the Tester Letter and the Malpractice Lawsuit <u>are</u> "connected by an inevitable or predictable interrelation or sequence of events." <u>Id.</u> at \*11. The Tester Letter faults Murphy for not submitting Rule 16.1's required witness disclosures. The Malpractice Lawsuit flows from Murphy's decision to proceed under Rule 16.1. Surely these two acts "attend or flow from the other in an inevitable or predictable way." <u>See</u> <u>id.</u> A required disclosure under Rule 16.1 and the decision to proceed under Rule 16.1 are predictably interrelated because the decision not to opt out of Rule 16.1 resulted in a timeline for witness disclosures under that rule.

Both parties then also discuss the case of <u>Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.</u>, 855 P.2d 1263 (Cal. 1993), which determined the meaning of "claim" and "related" under a claims-based legal liability insurance policy. In <u>Bay Cities</u>, the alleged malpractice was an attorney's failure to serve a "stop notice" on a construction project's lenders and a failure to timely foreclose on a mechanic's lien. 855 P.2d at 1264. The insurance policy provided coverage "for each claim" and further provided that "[t]wo or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim." <u>Id.</u>

18

Bay Cities argued that it was entitled to the policy limits for two claims because the attorney's two omissions resulted in separate injuries to Bay Cities. Id. at 1265. The insurer argued that Bay Cities had a single cause of action and a single injury stemming from the attorney's conduct. Id. The California Supreme Court in Bay Cities determined that the insurance policy's definition of "claim" limited Bay Cities to only one claim under the policy. Id. at 1266. The court stated:

> [W]hen, as in this case, a single client seeks to recover from a single attorney alleged damages based on a single debt collection matter for which the attorney was retained—there is a single claim under the attorney's professional liability insurance policy.
> . . .
> [I]f an attorney's single error harmed two clients and gave each of them a separate claim, those two claims would be treated as a single claim under the policy's limitation of liability. It would be anomalous to limit liability in that circumstance but to disregard the limitation when, as in this case, a single client suffers a single injury as a result of multiple errors.

Id.

The Bay Cities court then went on to determine, in the alternative, whether the insurance policy's "related acts, errors or omissions" language would limit Bay Cities to the policy's per claim limit. Id. at 1270. The court found that the term "related" was not ambiguous and that it was "broad enough to encompass both logical as well as causal relationships . . . ." Id. at 1271. The court found that the alleged acts of malpractice were related. Id. at 1275. The court noted

19

that the acts "arose out of the same specific transaction, the collection of a single debt," that the acts "arose as to the same client," that the acts were "committed by the same attorney," and that the acts "resulted in the same injury." Id.

Carolina Casualty argues that Bay Cities' reasoning should be applied here, and urges us to conclude that plaintiffs have one malpractice claim and that the alleged acts of malpractice in the Tester Letter and the Malpractice Lawsuit should be deemed related. Carolina Casualty analogizes Bay Cities because here: "(1) there is a single client—the Burkhardts; (2) there is a single attorney—Mr. Murphy; and (3) there is a single tort claim for which Mr. Murphy was retained." Appellee Br. at 23. Carolina Casualty also contends that the Burkhardts suffered a single harm from Murphy's alleged acts of malpractice—"the lost opportunity to recover some or all of their damages in the Ciri Lawsuit." Id. We agree with Carolina Casualty that the Burkhardts suffered one injury in the facts underlying this case. Where there is one injury flowing from multiple acts of malpractice, it seems logical to connect those multiple acts of malpractice as "related." See, e.g., Gregory v. Home Ins. Co., 876 F.2d 602, 606 (7th Cir. 1989) ("[T]he common understanding of the word 'related' covers a very broad range of connections, both causal and logical."). Because the insurance policy here treats as one claim all "related wrongful acts," we therefore conclude the Burkhardts state one claim.

And finally, a case cited by Carolina Casualty discusses the determination

20

of whether a single claim or multiple claims have been made under a claims-made legal liability insurance policy. See Eagle Am. Ins. Co. v. Nichols, 814 So. 2d 1083 (Fla. Dist. Ct. App. 2002). In Nichols, the insurance policy limited coverage per "claim" for "related wrongful acts." 814 So. 2d at 1086. The alleged acts of malpractice were the attorney's failure to name a hospital and each individual physician from that hospital as defendants in a medical malpractice lawsuit. Id. at 1084. Nichols asserted that he had multiple claims because "his attorney committed multiple wrongful acts by failing to join several defendants," depriving him of a claim against each defendant for that defendant's maximum liability coverage. Id. at 1085. The insurer alleged that Nichols had only one malpractice claim and one injury—the loss of a complete recovery. Id.

The court concluded that the negligent acts alleged by Nichols were logically related. The court stated:

> [I]n this case, the claim was for the entire amount of Nichols' uncollected damages as a result of the failure to join several defendants in the suit, and all of the acts of negligence caused or contributed to the inability of Nichols to collect the entire amount of his damages.

Id. at 1086. Similar to our discussion regarding the Bay Cities case above, we conclude that the Burkhardts' one malpractice cause of action resulting in the one claim for injury encompasses all alleged acts of malpractice related to that malpractice cause of action. Here, an alleged failure to comply with Colorado's rules for disclosure of witnesses is related to an alleged failure to opt out of those

21

same rules. We conclude that the Tester Letter and the Malpractice Lawsuit allege "related wrongful acts" under the insurance policy. Therefore, they should be considered one "claim" under that policy.

*C. Was Murphy an "insured" under plaintiffs' policy?*

The insurance policy covers claims that were first made to an "insured" during the policy period. Thus, we must now determine whether Murphy was an "insured" under the definitions of the policy when he received the Tester Letter.

As stated above, per the terms of the insurance policy, a "**Claim** shall be deemed to have been first made at the time notice of the **Claim** is first received by any **Insured**." App. at 40. An "Insured" is defined as:

> "**Insured**" means:
>
> 1. the **Named Insured** and any **Predecessor Firm**;
>
> 2. any individual or professional corporation who is or becomes a partner, officer, director, stockholder, or employee of the **Named Insured**, but solely while acting within the scope of their duties on behalf of the **Named Insured**;
>
> 3. <u>any individual or professional corporation who was a partner, officer, director, stockholder, or employee of the **Named Insured** or **Predecessor Firm**, but solely while acting within the scope of their duties on behalf of the **Named Insured** or **Predecessor Firm**</u>;
>
> 4. any individual or professional corporation designated "counsel" or "of counsel" to the **Named Insured**, but solely while acting within the scope of their duties on behalf of the **Named Insured** for

22

which a fee inured to the **Named Insured**;

> 5. the heirs, executors, administrators, and legal representatives of each **Insured** in the event of death, incapacity or bankruptcy, but solely with respect to the liability of each **Insured** as otherwise covered by this Policy.

Id. (underlining emphasis added).

Again, we find no ambiguity in the above-quoted language of the insurance policy. All the terms have ordinary, common meanings associated with them. The plain meaning of the applicable definitional subsection covers a very broad swath of individuals, and then narrows that swath. It begins with the phrase "any individual" and is then limited by a requirement that the individual "was a partner, officer, director, stockholder, or employee" of the "named insured," which was Timothy H. Berry, P.C. Id. (emphasis added). It is undisputed that Murphy was a co-shareholder in Berry & Murphy, P.C. and was therefore an individual who was a partner of the named insured.

The second limit on the "insured" definition is the language "but solely while acting within the scope of their duties on behalf of the **Named Insured**." Id. This clause, when read in context with the rest of this definitional subsection, cannot mean that an individual is an insured only while acting on behalf of the named insured, but must mean that an individual is an insured only if the claim being made is related to that individual's duties on behalf of the named insured. Otherwise, no former employee of the named insured could ever be an "insured."

23

If "insured" were interpreted to mean that an individual was an insured only while acting within the scope of business of the named insured, it would be paradoxical to define "insured" to include former employees – any individual "who <u>was</u> a partner, officer, director, stockholder, or employee of the Named Insured," Timothy H. Berry, P.C. <u>Id.</u> (emphasis added).

In our opinion, the better view is that "insured" is defined to include an individual after he has left the law firm if the claim involves that individual's acts or omissions that occurred while at the law firm.[6] Here, that is the case, because Murphy withdrew from the Ciri Lawsuit almost simultaneously with leaving Berry & Murphy, P.C. We therefore conclude that notice of the "claim" was given to Murphy, an "insured" via the Tester Letter, before the policy period.[7] As

---

[6] The dissent suggests that we have conflated the concepts of "notice" and "coverage." However, the policy language is clear and unambiguous. The policy provides a single definition of "Insured." The policy does not differentiate between who is an "Insured" for purposes of "coverage" and who is an "Insured" for purposes of "notice." If Murphy is an "Insured" for purposes of coverage, as the dissent contends, he is also an "Insured" for purposes of notice. The policy is clear as regards notice: a "**Claim** shall be deemed to have been made at the time notice of the **Claim** is first received by <u>any</u> **Insured**." App. at 40 (underlining emphasis added). "Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself. When a contractual provision is clear and unambiguous, courts should neither rewrite it nor limit its effect by a strained construction." <u>Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co.</u>, 874 P.2d 1049, 1055 (Colo. 1994) (internal citation omitted).

[7] Plaintiffs make a brief argument that because Murphy was no longer an agent of Berry & Murphy, P.C. at the time he received the Tester Letter, Berry & Murphy, P.C. can not be charged with notice of that letter. Aplt. Br. at 26. However, the insurance policy does not require an agency relationship within the

(continued...)

24

a result, Carolina Casualty had no duty to defend or indemnify plaintiffs.

Because Carolina Casualty had no legally cognizable duty to defend or indemnify a claim, plaintiffs' bad faith claim also cannot survive. Leprino v. Nationwide Prop. & Cas. Ins. Co., 89 P.3d 487, 492 (Colo. Ct. App. 2003). We affirm the judgment of the district court.

## III

We acknowledge that this is a harsh result for Thomas Berry. Murphy was apparently no longer in communication with Berry after he left their law firm and Murphy did not give Berry notice of the Tester Letter by which Berry could have notified his insurer of the malpractice claim. But the insurance policy's language requires this result, and that is the language Berry agreed to when he entered this contract with Carolina Casualty. The Colorado Supreme Court has given a summary of its rules for the interpretation of an insurance contract, which is particularly applicable here:

> An insurance policy is a contract which should be interpreted consistently with the well settled principles of contractual interpretation. This approach acknowledges that:
>
> > [A]n insurance contract is a mutual agreement, ratified by the insured by his acceptance, both parties are bound by its provisions, unless waived or

---

[7](...continued)
definition of "insured" and we find no basis for applying one to a contract which expressly defines the scope of the covered relationships.

25

annulled for lawful reasons. In the absence of statutory inhibition, an insurer may impose any terms and conditions consistent with public policy which it may see fit.

Chacon v. Am. Family Mut. Ins. Co., 788 P.2d 748, 750 (Colo. 1990) (internal quotations and citations omitted).

In addition, the Colorado courts recognize the utility of claims-made insurance policies:

> [I]n a "claims-made" policy, the notice provision provides a certain date after which an insurer knows it no longer is liable under the policy and, accordingly, allows the insurer to fix more accurately its reserves for future liabilities and compute premiums with greater certainty. . . . It is because of this significant role of notice in "claims-made" policies that numerous courts have held that excusing a delay in notice beyond the policy period should not be done, because to do so would alter a basic term of the insurance contract which expresses the parties' agreement.

Estate of Hunt, 811 P. 2d at 435. The same reasoning applies to refusing to excuse the failure to give notice of a claim when the initial notice of that claim was given prior to the start of the policy period. Carolina Casualty bargained for the terms of the insurance policy applied herein and we have found no basis to deprive them of the benefit of their bargain.

IV

The judgment of the district court is AFFIRMED.

26

09-1004, <u>Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.</u>

**LUCERO**, J. dissenting

The result in this case <u>is</u> harsh, but it is improperly so. Because the majority denies Timothy Berry the very coverage for which he paid premiums, thus creating a windfall for Carolina Casualty Insurance Company ("Carolina Casualty"), I respectfully dissent. What the majority does here is create an escape hatch by which insurers can promise coverage, collect premiums, and yet avoid responsibility to the named insured by redefining notice in a manner inconsistent with the insurance contract and Colorado law.

I agree with the majority that the Tester Letter and the Malpractice Lawsuit are "logically or causally connected" and thus constitute a single "Claim" under the policy at issue. (Majority Op. 17, 21.) However, I disagree with the majority's conclusion that delivery of the Tester Letter to Seth Murphy constituted notice to an insured under the policy's terms. (<u>Id.</u> at 21-24.)

In construing the policy's definition of "Insured," the majority opinion misapplies Colorado law. At a minimum, that definition is ambiguous as to whether a former stockholder is an insured for notice purposes. I would resolve this ambiguity against Carolina Casualty, and hold that Murphy was not an insured acting within the scope of his duties to Berry & Murphy, P.C. at the time he received notice of Oksana and William Burkhardt's claim. It was Berry who was the first insured acting within the scope of his duties on behalf of the premium-paying insured to receive notice of the Burkhardts' claim. Because Berry both received notice and advised the defendant-insurer within the

policy period, the district court's grant of summary judgment to Carolina Casualty was erroneous.

**I**

As I do not take issue with the majority's factual recitation, I repeat only a few key facts. Under the policy, a claim is "deemed to have been first made at the time notice of the Claim is first received by any Insured." "Insured" is defined in relevant part to mean "any individual . . . who was a . . . stockholder . . . of the . . . Predecessor Firm, but solely while acting within the scope of their duties on behalf of the . . . Predecessor Firm." It is undisputed that Murphy was once a stockholder of Berry & Murphy, P.C. and that Berry & Murphy, P.C. is a "Predecessor Firm" to Timothy H. Berry, P.C., the "Named Insured." However, the definition of insured contains a further limitation: A former stockholder is only an insured "while acting within the scope of their duties on behalf of the . . . Predecessor Firm."

Murphy received the Tester Letter, which put him on notice of the Burkhardts' malpractice claim, on January 26, 2007, nearly a year after he left Berry & Murphy, P.C. The Tester Letter was addressed to Murphy at his new firm, Richmond Sprouse & Murphy, LLC, and Murphy forwarded the letter to his new firm's insurer (coincidentally, also Carolina Casualty). Berry, who remained a stockholder of the named insured, did not receive notice of the Burkhardts' complaint until nearly a year and a half later, on July 23, 2008.

What the majority does is conflate two inquiries, <u>coverage</u> and <u>notice</u>. Although the policy utilizes the same definition of an "Insured" for various purposes, that definition's use of the phrase "but solely while acting within the scope of their duties" must necessarily be read in different time contexts for coverage and notice. Because a claims made policy is under consideration, assuredly the law firm is covered for liability incurred by previous stockholders and employees for past acts. And because Murphy was a stockholder at the time some of the predicate acts of negligence are claimed to have occurred, he also is covered. The majority goes off track when it comes to notice. It does so by failing to recognize that a former stockholder of a law firm not presently in privity with the named insured cannot be said to be acting within the scope of his duties to the previous firm for notice purposes. The majority's reasoning is tantamount to holding that service of process on Berry could be accomplished by serving his former partner. No one would seriously insist that such notice was proper let alone would satisfy due process requirements. Yet, the majority's unfortunate construction of this insurance contract permits the same result.

The majority contends that "Insured" means "an individual after he has left the law firm if the claim involves that individual's acts or omissions that occurred while at the law firm." (Majority Op. 23.) But this reading is wholly unmoored from the text of the policy and violates Colorado jurisprudence regarding insurance contract interpretation.

As with any contract, Colorado courts construe insurance policies "to promote the intent of the parties." State Farm Mut. Auto. Ins. Co. v. Stein, 940 P.2d 384, 387 (Colo. 1997). "Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself." Parrish Chiropractic Ctrs., P.C. v. Progressive Cas. Ins. Co., 874 P.2d 1049, 1055 (Colo. 1994). Courts should "not rewrite a contractual provision that is clear and unambiguous, but must give effect to the plain and ordinary meaning of its terms." Wota v. Blue Cross & Blue Shield of Colo., 831 P.2d 1307, 1309 (Colo. 1992) (citation omitted). "However, where there is ambiguity or uncertainty as to coverage, courts should construe the policy in favor of the insured." Republic Ins. Co. v. Jernigan, 753 P.2d 229, 232 (Colo. 1988).

Applying these rules of contract interpretation, Murphy was not an insured when he received notice of the Burkhardts' claim. An "individual . . . who was a . . . stockholder . . . of the . . . Predecessor Firm" is an insured, "but solely while acting within the scope of their duties on behalf of the . . . Predecessor Firm." Because the latter limitation does not employ words with technical or specialized meanings, we should adopt "the plain and ordinary meaning of its terms." Wota, 831 P.2d at 1309. In ordinary English usage, stating that Murphy is an insured, "but solely while acting within the scope of [his] duties on behalf of" Berry & Murphy, P.C., means that Murphy is not an insured while acting outside the scope of his duties on behalf of that firm. In other words, Murphy is an insured for the purposes of certain acts (acts committed within the scope of his duties on behalf of his former firm) but not others (acts committed outside the scope of his duties). There is no dispute that Murphy was not acting on behalf of

4

Berry & Murphy, P.C. when he received the Tester Letter; thus notice to him was not notice to an insured.

According to the majority, "but solely while acting within the scope of their duties on behalf of" a predecessor firm "cannot mean that an individual is an insured only while acting on behalf of" a predecessor firm. (Majority Op. 23.) Yet that is precisely how "Insured" is defined in the policy.

This policy definition is rejected by the majority through utilization of "the general rule of contract construction that a court should seek to give effect to all provisions so that none will be rendered meaningless." Pub. Serv. Co. v. Wallis & Cos., 986 P.2d 924, 933 (Colo. 1999) (quotation omitted). We are told by the majority that "[i]f 'insured' were interpreted to mean that an individual was an insured only while acting within the scope of business of the named insured, it would be paradoxical to define 'insured' to include former employees." (Majority Op. 23.)

But interpreting the definition of insured consistent with its ordinary meaning does not render the clause at issue meaningless; it simply makes it unlikely that a former stockholder can receive notice of a claim. Only if it is established that a former stockholder has given notice in fact to his previous employer may an issue of notice in this context be properly raised. The defined term "Insured" is used throughout the policy. And although the plain meaning of the former stockholder clause would rarely carry force with respect to the policy's notice provision, it fits perfectly well in other contexts. For example, the policy defines "Professional Services" in part as services "rendered by an Insured solely as a lawyer, mediator, arbitrator, or notary public for others."

5

"Professional Services" would thus include services rendered by an individual who was a stockholder of a predecessor firm, but solely while acting within the scope of their duties on behalf of the predecessor firm as a lawyer, mediator, arbitrator, or notary public for others. That is, "Professional Services" refers to services rendered by a person who is now a former stockholder, but only those services that the former stockholder rendered while acting on behalf of the predecessor firm.

Moreover, the plain text meaning of the former stockholder clause can be given effect with respect to the policy's notice provision. An individual can be both a former stockholder and acting on behalf of her former law firm in certain circumstances. An individual might semi-retire from the practice of law and renounce stockholder status, but take occasional cases on behalf of her former firm on a contract basis. The ordinary meaning of the definition of insured cannot be dispatched simply because its operation is unlikely; rather, it must be meaningless. See Pub. Serv. Co., 986 P.2d at 933.

Further, in rejecting the plain text construction of the former stockholder clause, the majority fails to apply Colorado case law holding that policy language must be construed in favor of the insured where it is "susceptible to more than one reasonable interpretation." Id. at 931. I submit that the ordinary meaning of the former stockholder clause is a reasonable interpretation. Although the majority's construction comports with the general understanding of a claims made policy, it ignores the policy's plain text. Absent an absurd result, see Huizar v. Allstate Ins. Co., 952 P.2d 342, 345 (Colo. 1998), we are not free to "rewrite, add, or delete provisions in our interpretation," General Sec. Indem. Co. v. Mt. States Mut. Cas. Co., 205 P.3d 529, 532 (Colo. Ct. App. 2009). It is

6

not absurd for an insurance policy to provide coverage for the prior acts of a former stockholder while not treating her as an insured for notice purposes.

"The majority opinion is not simply interpreting what this insurance contract covers; it is interpreting what the majority thinks the insurance contract ought to cover. . . . [W]e should not rewrite insurance contracts based on what we think the insured might have intended." Fire Ins. Exch. v. Sullivan, 2009 Colo. App. LEXIS 994, at *17-18 (Colo. Ct. App. May 28, 2009) (quotation omitted) (adopting the approach of a Maryland dissent in applying Colorado contract law).

### III

Murphy was not an insured when he received the Tester Letter. Thus, the Burkhardts' claim cannot be deemed to have been made with delivery of that letter. Instead, the evidence shows that the claim was first made to an insured on July 23, 2008, when Berry accepted service of the Burkhardts' complaint. The policy covers claims made from February 6, 2008, to February 6, 2009. Because the Burkhardts' claim was made within the policy period, I would reverse the district court's grant of summary judgment in favor of Carolina Casualty and remand for further proceedings.